**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

ALAN ELLIS,

           Plaintiff,

vs.

RONALD GOLDBERG,

          Defendant.

No. C 16-4119-MWB

**OPINION AND ORDER
REGARDING TRIAL ON THE
MERITS**

---

**TABLE OF CONTENTS**

I.    **INTRODUCTION**............................................................................... 2
    **A.**    *Findings Of Fact*..................................................................... 2
        *1.*    *The parties' stipulated facts* ............................................ 2
        *2.*    *The parties*........................................................................ 3
        *3.*    *The parties' negotiations*................................................ 4
        *4.*    *The parties' agreement*................................................... 6
        *5.*    *The parties' performance* ............................................... 8
        *6.*    *The defendant's interest in the Florida property* ................... 11
        *7.*    *The value of Mr. Ellis's services* ..................................... 12
    **B.**    *Procedural Background* ........................................................ 13
II.   **Legal Analysis** ............................................................................... 15
    **A.**    *Choice Of Law* ..................................................................... 16
    **B.**    *Breach Of Contract* ............................................................. 17
        *1.*    *Applicable law* ................................................................. 17
        *2.*    *Analysis* ............................................................................ 18
           *a.*    *Existence of the contract* ....................................... 18
           *b.*    *Breach*..................................................................... 21
           *c.*    *Damages* ................................................................. 22
        *3.*    *Summary* ........................................................................... 23
    **C.**    *Fraud*.................................................................................... 23
        *1.*    *Applicable law* ................................................................. 23
        *2.*    *Analysis* ............................................................................ 25

   *a.*   *Proof of fraud* .................................................. 25

   *b.*   *Damages* ......................................................... 27

  *D.*   *Unjust Enrichment* ............................................. 30

*III.*  *CONCLUSION* ............................................................ 31

I n this case, a criminal defense attorney alleges that his client breached a contract to pay for his services in representing the client at his sentencing in federal district court in South Dakota and committed fraud concerning his intent to pay for those services. In the alternative, the attorney asserts that the client was unjustly enriched by his failure to pay the attorney for his services. Following a bench trial on January 10, 2019, I find in favor of the attorney on his claims of breach of contract and fraud for the reasons set forth in this opinion.

## I.    INTRODUCTION

### A.    Findings Of Fact

#### 1.   The parties' stipulated facts

The parties stipulated only to the following facts in the Final Pretrial Order:

> Alan Ellis, the plaintiff in this case, is a member of the state bar of Pennsylvania, who specializes in sentencing in federal criminal court. Mr. Ellis's offices are in San Francisco and New York. Mr. Goldberg, the defendant in this case, was scheduled to be sentenced in a federal criminal case [*United States v. Goldberg*, No. 4:11-cr- 40111-KES,] by the Honorable Karen Schreier on February 29, 2016, in

Sioux Falls, South Dakota. Mr. Goldberg's attorney in that case, Peter Bendorf, sponsored Mr. Ellis's admission *pro hac vice* to Judge Schreier's court, so that Mr. Ellis could appear on Mr. Goldberg's behalf at the sentencing. Mr. Ellis did appear with Mr. Goldberg at Mr. Goldberg's sentencing hearing on February 29, 2016.

Although this stipulation identifies the parties and some of the circumstances that give rise to their present dispute, it plainly does not address all the pertinent facts. The facts supported by the evidence presented at the bench trial fill in the rest of the story.

### 2.    *The parties*

Mr. Goldberg is now a resident of Arnolds Park, Iowa.[1] From time to time, including in various correspondence with Mr. Ellis, Mr. Goldberg has indicated that he is the "President/CEO" of "Alliance Capital Corp." (ACC) and that he maintains an office with ACC at an address in New York City. Plaintiff's Trial Exs. 5, 6, 7, 11, 12, 13, 14, 15. In response to interrogatories, Mr. Goldberg stated that the nature of ACC's business was "Consulting." Plaintiff's Trial Ex. 32 (Defendant's Answers to plaintiff's First Set Of Interrogatories, Interrogatory No. 24). He also stated in response to those interrogatories, however, that he did not remember the date ACC was founded; that ACC does not currently have any officers, executives, or other company leaders; and that ACC does not have any employees. *Id.* Based on this evidence, and the lack of any other evidence concerning ACC, I find that ACC is simply a name under which Mr. Goldberg conducts business, not an actual business entity.

At some point, Mr. Goldberg was indicted in the United States District Court for South Dakota on charges of bank fraud, access device fraud, wire fraud, and aggravated identity theft. *See* Plaintiff's Exhibit 28 (Fourth Superseding Indictment in *United States*

---

[1] At the time of trial, however, Mr. Goldberg was staying in southern Florida, awaiting surgery.

*v. Goldberg*, No. CR11-401111-KES (S.D. Oct. 6, 2015)). The evidence at trial in this case reflects that, on October 13, 2015, Mr. Goldberg entered into a plea agreement, Plaintiff's Trial Ex. 29, to plead guilty to two counts of bank fraud and one count of wire fraud in that case, and the parties agree that Mr. Goldberg did, in fact plead guilty in the federal criminal case in South Dakota. As of February 2016, Mr. Goldberg was awaiting sentencing in that criminal case.

Eventually, Mr. Goldberg sought out Mr. Ellis to represent him at sentencing, because he had had previous contact with Mr. Ellis. Mr. Ellis testified that he "may have" represented Mr. Ellis during the 1970s or perhaps the early 1980s, that he could not now recall whether he had ever actually represented Mr. Goldberg, but that he could not be sure without consulting records not available to him at the time of trial. On the other hand, Mr. Ellis testified that he knew for certain that he had contact by mail with Mr. Goldberg at that time. Mr. Goldberg did not clarify at trial how he knew, or knew of, Mr. Ellis or what prompted him to seek out Mr. Ellis to represent him.

### 3. *The parties' negotiations*

At the time that Mr. Goldberg first contacted Mr. Ellis about representing him in the federal criminal case in South Dakota, Mr. Goldberg was still in the Yankton County Jail on the charges in that case. The earliest written communications between Mr. Goldberg and Mr. Ellis that are in the trial record, here, are dated June 9, 2015, *see* Plaintiff's Trial Exs. 9 and 10, several months before Mr. Goldberg's sentencing in February 2016. These communications, which are from Mr. Ellis, are addressed for mailing to Mr. Goldberg at the Yankton County Jail and addressed for emailing to Mr. Goldberg at a personal gmail.com address. *See id*. They are a letter, which states, *inter alia*, "I must have a signed agreement and retainer before I can do any work on your case," Plaintiff's Trial Ex. 9 at 1, and a proposed Engagement Agreement, which, *inter alia*, required a non-refundable retainer of $75,000, with an additional $5,000 to be

escrowed for expenses, Plaintiff's Trial Ex. 10 at 2. The rub was that Mr. Goldberg was unable to pay Mr. Ellis a retainer in advance.

Mr. Ellis testified that, when Mr. Goldberg contacted him in February 2016, Mr. Goldberg told him that he had pleaded guilty to various fraud offenses and that he had gone through a succession of lawyers. Mr. Goldberg elicited testimony from Mr. Ellis that he does not recall whether Mr. Goldberg's prior attorneys were retained or appointed, but I find that Mr. Ellis's uncertain memory about a trivial matter has trivial impact on Mr. Ellis's credibility. By emails dated February 3 and 4, 2016, Mr. Goldberg and Mr. Ellis exchanged further correspondence and various drafts of fee agreements. *See* Plaintiff's Trial Exs. 11-15. In the course of the parties' negotiations, Mr. Goldberg represented that he had an interest in a Florida property that was about to be sold and that he could pay Mr. Ellis's fee from the proceeds of that sale. Mr. Ellis testified at trial that Gary Mason, Mr. Goldberg's attorney for civil matters, provided Mr. Ellis with an "Irrevocable Payoff Confirmation," signed by Mr. Goldberg on February 2, 2016, Plaintiff's Trial Ex. 27, which documented Mr. Goldberg's interest in $202,000 of the proceeds from the sale of the Florida property. Mr. Ellis testified at trial that he also exchanged emails with Mr. Mason about the mechanics of being paid from the proceeds of the sale of the Florida property. Plaintiff's Trial Ex. 11. Mr. Ellis testified that, in reliance on Mr. Goldberg's and Mr. Mason's representations that his fee would be paid, by wire of funds, upon the sale of the Florida property, he agreed to represent Mr. Goldberg.

The later communications from Mr. Ellis to Mr. Goldberg in the trial record, dated February 3 and 4, 2016, show a mailing address for Mr. Goldberg, as "President/CEO," at his office at ACC in New York City and/or a "corporate" email address for Mr. Goldberg, which includes alliancecapital@gmail.com. *See* Plaintiff's Trial Exhibits 11-15. At trial, Mr. Goldberg argued that this change in the addresses for

the parties' exchanges while negotiating the Engagement Agreement from the Yankton County Jail and a personal email address, in June of 2015, to "corporate" addresses, sometimes indicating his "corporate" titles, in February of 2016, demonstrates that the parties understood that ACC was the party negotiating and entering into the Engagement Agreement. Mr. Ellis testified, however, that he simply sent materials to Mr. Goldberg at the Yankton County Jail and his "personal" addresses while Mr. Goldberg was in custody, but that he sent them to Mr. Goldberg's "corporate" addresses when he was not in custody, because those were the addresses he had for Mr. Goldberg. Mr. Ellis also testified that it was never his understanding that he was contracting with ACC for the payment of the fee to represent Mr. Goldberg. I find Mr. Ellis's testimony about why he addressed correspondence to Mr. Goldberg certain ways at certain times to be credible and that it provides a far more likely and reasonable explanation than Mr. Goldberg's theory. Indeed, at the time that the parties signed the Engagement Agreement, Mr. Goldberg had already been released from custody pending sentencing.[2]

### 4. The parties' agreement

Ultimately, Mr. Ellis and Mr. Goldberg both signed an "Engagement Agreement," dated February 5, 2016. Plaintiff's Trial Ex. 1 (Engagement Agreement). The Engagement Agreement was in the form of a letter addressed "Dear Mr. Goldberg," at his office in New York City, and states that it "describes the basis on which our firm will provide legal services to you and bill for those services" and specifically identifies those services as pertaining to "the case of United States v. Ronald Goldberg, No. 4:11-cr-40111-KES, United States District Court for the District of South Dakota to represent

---

[2] According to the testimony at the bench trial, Mr. Goldberg had been released from custody prior to his sentencing, because the time he had been held in pretrial custody exceeded his likely guidelines sentencing range.

you as lead counsel in an endeavor to obtain for you a time-served sentence."
Engagement Agreement, 1 (¶ 1. SERVICES).[3] No other person or entity is identified
anywhere in the Engagement Agreement as the party to whom services were to be
provided or as the entity contracting for services on Mr. Goldberg's behalf, and
Mr. Goldberg's signature line does not indicate any title or otherwise suggest that he was
signing the Engagement Agreement in anything but his individual capacity.

      Paragraph 3 of the Engagement Agreement, entitled "FEES," provided as follows:

> We have agreed upon a fixed fee of $65,000 including expenses. You will have sent to me by Gary Mason, Esquire $65,000. You will, however, pay local counsel Peter Bendorf directly and I will not be responsible for his fees and expenses. It is understood that we are <u>not</u> entering into an hourly rated contract. This means that our firm will devote such time as is necessary in this matter, but our compensation will not be increased or decreased based upon the amount of hours expended by our firm. In setting the fixed fee, our firm has taken into consideration the degree of difficulty of the case; the urgency of the matter; necessity of declining other work based upon the hours required to do this case and the prohibition of our undertaking any representation of any other client which may conflict with your interests; and our degree of expertise in the handling of your matter.

> The firm will have no obligation to provide legal services until you return a signed copy of this contract to the firm and further agree that this agreement shall also serve as an irrevocable directive to Gary Mason, Esquire, by you for Mr. Mason to pay me $65,000 from the sale of the Fisher Island, Florida, property.

---

[3] This paragraph of the Engagement Agreement continued, "and if for any reason you are sentenced in excess of time served, we will represent you in an effort to get you placed in the best facility possible for the service of your sentence."

Engagement Agreement at 3. I will call the Fisher Island, Florida, property "the Florida property" in this opinion. The Engagement Agreement also includes as the last paragraph above the signature block the statement, "Because there exists an attorney-client relationship between us, you are advised that you may wish to seek the advice of independent counsel regarding the terms and conditions of this fee agreement." *Id*. at 4 (¶ 8). On February 9, 2016, Mr. Mason also signed the Engagement Agreement with the handwritten annotation, "solely with regard to ¶ 3."

    *5.    The parties' performance*

The United States District Court for the District of South Dakota admitted Mr. Ellis to practice *pro hac vice* to represent Mr. Goldberg at his sentencing. Plaintiff's Trial Ex. 2. Mr. Ellis testified at trial that he hired a psychiatrist, Dr. Sarah Flynn, as an expert for Mr. Goldberg's sentencing. Mr. Ellis also submitted, as Plaintiff's Trial Ex. 16, another "irrevocable assignment" from Mr. Goldberg of $5,000 of the proceeds of the sale of the Florida property to pay Dr. Flynn.

Mr. Ellis represented Mr. Goldberg at the sentencing hearing on February 29, 2016. The court imposed the hoped-for sentence of time served on Mr. Goldberg, with subsequent supervised release, and restitution in the amount of $34,646.18. Plaintiff's Trial Ex. 4 (Judgment). Mr. Ellis submitted evidence that Mr. Mason provided a declaration, Plaintiff's Trial Ex. 18, averring to the sentencing court that Mr. Goldberg's criminal restitution obligation would also be paid from the proceeds of the sale of the Florida property and that Mr. Goldberg had executed an irrevocable assignment, Plaintiff's Trial Ex. 19, committing some of the proceeds of the sale of the Florida property to the court for purposes of guaranteeing the payment of restitution. Mr. Ellis pointed out that the Judgment in the South Dakota case, Plaintiff's Trial Exhibit 4, states on page 4, under Special Conditions Of Supervision, *inter alia*, "The defendant shall execute an Irrevocable Assignment to pay restitution from a real estate transaction

scheduled to close on 03/08/2016." After the sentencing hearing, Mr. Goldberg expressed his satisfaction with Mr. Ellis's representation and his gratitude to him in emails to Mr. Ellis dated February 29, 2016, and March 1, 2016. Plaintiff's Trial Exs. 5 and 6.

In addition, Mr. Ellis testified at trial that, at the end of the sentencing hearing, Mr. Goldberg was so happy that he called Mr. Mason and directed him to draft another irrevocable agreement to the effect that, if Mr. Ellis "walked [Mr. Goldberg] out of court" that day, Mr. Goldberg would give him a $25,000 bonus. Mr. Ellis repeatedly testified that he did not ask for such a bonus, that it was a surprise to him, and that it was entirely Mr. Goldberg's idea. Plaintiff's Trial Exhibit 17 is, indeed, an "Irrevocable Assignment," bearing the caption of the South Dakota criminal case, signed by Mr. Goldberg on February 29, 2016, which states that it was by and between Mr. Goldberg and Mr. Ellis. It assigned to Mr. Ellis a sum of $35,000 (rather than $25,000) from a distribution to Mr. Goldberg "from the net settlement proceeds or net judgment recovery in the matter of *The Watley Group, L.L.C. v. Joel Silver, et al*, case number BC592332, pending in the Superior Court of the State of California, County of Los Angeles, Central District, provided Assignor, Ronald J. Goldberg, is not required to undergo any additional prison time in the above referenced matter."

Mr. Goldberg's version of events leading up to this "Irrevocable Assignment" is that Mr. Ellis had threatened to withdraw from representing him at his sentencing if Mr. Ellis did not receive a larger fee. Mr. Goldberg also contends that Mr. Ellis gave contradictory testimony about whether this "Irrevocable Assignment" was signed before or after the sentencing hearing; that it was a contingent fee in a criminal matter, which is improper under ethical rules; and that Mr. Ellis demanded and coerced the additional "Irrevocable Assignment" from him by threatening to withdraw from his case. Mr. Ellis testified that he did not recall ever threatening to withdraw from representing

9

Mr. Goldberg and denied attempting to coerce the "Irrevocable Assignment." Instead, Mr. Ellis reiterated that the "Irrevocable Assignment" was a surprise bonus that was entirely Mr. Goldberg's idea.

Again, I find Mr. Ellis's version of this matter more credible than Mr. Goldberg's version. More importantly, however, for present purposes, because Mr. Ellis never received any proceeds from the *Watley* matter and does not seek to recover any fee beyond the $65,000 set out in the parties' February 5, 2016, Engagement Agreement, I have considered this matter of the "Irrevocable Assignment" of proceeds from the *Watley* matter only as it relates to the parties' credibility.

Notwithstanding Mr. Goldberg's emails of praise immediately after the sentencing hearing, his subsequent correspondence with Mr. Ellis took a different tone. On March 16, 2016, Mr. Goldberg sent Mr. Ellis an email explaining that, because Mr. Mason had notified him that there were "judgments" entered against him while he was incarcerated, "It looks like nobody will get anything until I can get this matter cleared up," *i.e.*, that Mr. Ellis would not be paid from the proceeds of the sale of the Florida property. Plaintiff's Trial Ex. 7. In the same email exchange, however, Mr. Goldberg told Mr. Ellis, "I will pay the doctor [*i.e.*, Dr. Flynn] by early next week. If the judgments cannot be immediately opened, I will personally borrow some money and give it to you." *Id.* No evidence of what "judgments" produced this situation was presented at the trial. In his response, Mr. Ellis warned Mr. Goldberg that, because of the assignment he had filed "for restitution," Mr. Goldberg "may be viewed as having perpetrated a fraud upon the court, which could result in your supervised release being violated and you [being] returned to prison." *Id.* On March 18, 2018, Mr. Ellis received an email from an Assistant United States Attorney confirming that, on March 17, 2016, the clerk of court had received $34,936.18 for Mr. Goldberg's restitution and special assessment. Plaintiff's Trial Ex. 8. Neither party provided any information about the source of the

funds to pay the restitution and special assessment. No funds for Mr. Ellis's fees were forthcoming, however.

At trial, Mr. Goldberg challenged the notion that his restitution was, in fact, due in a lump sum, in support of his contention that Mr. Ellis's reference to Mr. Goldberg's need to pay his restitution or run the risk of sanctions for a fraud on the court was another attempt to coerce him to find the money to pay Mr. Ellis's fee. Mr. Goldberg pointed to the Judgment in the criminal case, Plaintiff's Trial Exhibit 4, page 6, which states under the Schedule Of Payments, "Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:  A.  Lump sum payment of $34,936.19 due immediately, balance due in accordance with C below; or . . .  C. Payment in equal monthly installments of $300.00, to commence 30 days after the date of this Judgment." I believe, based on this somewhat strange language of the Schedule Of Payments, that payment of the restitution and the special assessment in a lump sum was anticipated, but that the Schedule Of Payments also provided for monthly installments if, for example, payment of the restitution in a lump sum from the Irrevocable Assignment, recognized in the Special Conditions Of Supervision, was not forthcoming. I need not unravel that matter, however, because even if payment of the restitution was not necessarily due in a lump sum, it was not unreasonable for Mr. Ellis to believe that Mr. Goldberg could be sanctioned for a fraud upon the court based on his Irrevocable Assignment to pay the restitution from the proceeds of the sale of the Florida property, if he did not do so.

Unfortunately, no payment of Mr. Ellis's fee has ever appeared.

### 6.    *The defendant's interest in the Florida property*

At some point after Mr. Ellis learned that he would not be paid as expected from proceeds of the sale of the Florida property, Mr. Ellis hired a Florida company to investigate Mr. Goldberg's interest in the Florida property. That investigation discovered

a Notice of Affidavit of Interest, dated June 18, 2015, seeking a lien in favor of ACC in the amount of $400,000, "for services rendered," and a subsequent Notice and Claim of Lien in favor of ACC, dated August 6, 2015. Plaintiff's Trial Exs. 20, 21, respectively. The investigation also produced an August 16, 2015, mortgage and security interest in the Florida property that had been granted by the owners of the property to "Ron Goldberg and/or Alliance Capital Corp." Plaintiff's Trial Ex. 22. The investigation revealed that, on February 29, 2016, the same day as Mr. Goldberg's sentencing, Mr. Goldberg had, on behalf of ACC, signed a satisfaction of the mortgage on the property, a release discharging ACC's lien on that property, and a release of the Notice of Affidavit of Interest, Plaintiff's Trial Exs. 23, 25, 26, and that, on March 8, 2016, Mr. Goldberg signed a joinder of satisfaction of the mortgage on the Florida property in his personal capacity, Plaintiff's Trial Ex. 24.

On or about March 10, 2016, the Florida property was sold. Whatever distribution was made of the funds from that sale, no part of the distribution found its way to Mr. Ellis to pay his fee for representing Mr. Goldberg. Mr. Ellis testified that Mr. Goldberg did not disclose to him, either at or after the sentencing hearing, that Mr. Goldberg had released his interest in the Florida property, and Mr. Goldberg did not dispute that testimony.

### 7.     *The value of Mr. Ellis's services*

Mr. Ellis submitted evidence that he calculated the fair market value of his services to Mr. Goldberg to be $88,000. Mr. Goldberg submitted the testimony of a local attorney, Matthew Metzgar, that he estimated that about 29 hours were required to perform the work that Mr. Ellis had performed on Mr. Goldberg's criminal case. Mr. Metzgar also testified concerning the hourly rates of attorneys in the area as well as the hourly rates for court-appointed counsel in South Dakota and Iowa.

## B.    *Procedural Background*

On September 29, 2016, Mr. Ellis filed a Complaint And Demand For Jury Trial against Mr. Goldberg in this court based on diversity jurisdiction. In Count One, a claim of breach of contract, Mr. Ellis alleges that Mr. Goldberg breached his duty under the Engagement Agreement to pay him $65,000 in exchange for the services he provided to Mr. Goldberg. In Count Two, a claim of fraud, Mr. Ellis alleges that Mr. Goldberg represented to him that he would be paid $65,000 upon closing of the sale of the Florida property; that Mr. Goldberg "buttressed" that representation by providing Mr. Ellis with a copy of a "Notice and Claim of Lien" purporting to document the source of the funds from which Mr. Ellis would be paid; that Mr. Mason "bolstered" Mr. Goldberg's representation to Mr. Ellis by promising to wire Mr. Ellis the funds owed upon the closing on the Florida property, pursuant to an "Irrevocable Directive"; but that the very same day that Mr. Ellis discharged his obligation to represent Mr. Goldberg at his sentencing hearing, Mr. Goldberg executed a release of his interest in the property that was to provide funds to pay Mr. Ellis. Thus, Mr. Ellis alleges that Mr. Goldberg knowingly made a false representation to Mr. Ellis that he would be paid from the proceeds of the sale of the Florida property; that Mr. Mason represented on Mr. Goldberg's behalf that Mr. Goldberg agreed to pay for Mr. Ellis's services; and that Mr. Ellis relied on those representations to his detriment. In Count Three, a claim of unjust enrichment, Mr. Ellis alleges that Mr. Goldberg received the benefit of Mr. Ellis's professional services with a fair market value of $88,000; that Mr. Goldberg was aware that he received the benefit of Mr. Ellis's services and was satisfied with the services; and that Mr. Goldberg would be unjustly enriched if he retains the benefits of those services without being required to reimburse Mr. Ellis for the cost of those services. Mr. Ellis seeks compensatory, general, punitive, and special damages, plus his costs and

disbursements, pre- and post-judgment interest, and such other relief as the court determines to be just and proper.

Mr. Goldberg filed a *pro se* Motion To Dismiss For Lack Of Subject Matter Jurisdiction on December 5, 2016, but I denied that motion on March 6, 2017. The case was then set for a jury trial to begin on July 9, 2018. On June 13, 2018, Mr. Ellis filed a Motion For Default Entry, because Mr. Goldberg had not filed an answer after denial of his Motion To Dismiss, but I denied that motion, the same day, on the ground that, although Mr. Goldberg had not filed an answer, he had filed a Motion To Dismiss and otherwise appeared and defended. I did, however, grant Mr. Goldberg's email request for leave to file an answer. Shortly thereafter, on June 13, 2018, Mr. Ellis filed a notice of his withdrawal of a jury demand on his claims. On June 15, 2018, Mr. Goldberg filed a *pro se* Answer to Mr. Ellis's Complaint denying all of Mr. Ellis's claims. No counsel has appeared on Mr. Goldberg's behalf, and Mr. Goldberg represented himself *pro se* at trial.

Mr. Ellis filed a Trial Brief on June 21, 2018, in anticipation of the July 9, 2018, trial date. On June 26, 2018, I filed a Final Pretrial Order, as proposed by the parties. Although both parties submitted witness lists, only Mr. Ellis submitted an exhibit list with the parties' proposed final pretrial order. On July 2, 2018, a week before trial was to begin, the parties filed a Stipulated Motion For Continuance of up to ninety days while they attempted to consummate a settlement. Consequently, the bench trial in this matter was reset to begin on November 1, 2018. The court was not notified of any settlement. Therefore, in a Trial Management Order filed October 31, 2018, I once again reset the bench trial to begin on January 10, 2019, owing to a conflict in my schedule with the November 1, 2018, trial date. In the October 31, 2018, Trial Management Order, I granted Mr. Ellis permission to appear at trial via videoconference (VTC), but I stated that the onus was on him to contact the district's technology personnel to arrange the

logistics for the VTC. In that order, I also advised the parties that "[n]o further continuances will be granted."

On January 4, 2018, I held a telephonic conference with Mr. Ellis's counsel and Mr. Goldberg to address information provided to me by email that Mr. Goldberg's health would prevent him from traveling to Sioux City, Iowa, for the bench trial on January 10, 2019. I requested more information from Mr. Goldberg's doctor to verify that Mr. Goldberg was unable to travel for the trial. I received some additional information from Mr. Goldberg's doctor, so on January 7, 2019, by text order, I notified the parties that I accepted Mr. Goldberg's assertion that he was unable to travel to Sioux City for the bench trial as scheduled. Consequently, I gave Mr. Ellis until the end of the day to inform the court if he accepted Mr. Goldberg's participation by telephone or requested a continuance of the trial to a later date. Mr. Ellis notified the court that he consented to Mr. Goldberg's appearance by telephone at the bench trial. Therefore, this matter proceeded to a bench trial on January 10, 2019.

At the trial, Mr. Ellis's counsel was personally present, but Mr. Ellis appeared by VTC, and Mr. Goldberg appeared by telephone. Mr. Ellis appeared as his only witness. Mr. Goldberg presented the in-person testimony of Mr. Matthew Metzgar, a Sioux City attorney, as a witness on what he would charge for services similar to those provided by Mr. Ellis. Mr. Goldberg also offered Mr. Metzgar's report as a trial exhibit. Although there were some minor technological problems, the parties conducted the trial in a very civil and professional fashion.

I now turn to my legal analysis and verdict on Mr. Ellis's claims in the bench trial.

## II.    LEGAL ANALYSIS

This legal analysis includes some further findings of fact. I will address Mr. Ellis's breach of contract and fraud claims, in turn, then consider his unjust

enrichment claim only if or to the extent necessary. I will do so, because Mr. Ellis acknowledged in his trial brief that the unjust enrichment claim is in the alternative to his breach of contract claim, so that I should consider his unjust enrichment claim only if I find that there was no binding contract between the parties. However, before considering any of Mr. Ellis's claims, I must address the issue of the applicable law.

## A. *Choice Of Law*

In his trial brief, Mr. Ellis points out that there is no choice-of-law clause in the parties' Engagement Agreement. Consequently, he argues that, in a diversity action such as this, applying choice-of-law rules of Iowa, the forum state, I should apply South Dakota law to his claims, because South Dakota is the jurisdiction with the most significant relationship. Mr. Goldberg has not argued otherwise, because he filed no trial brief, did not raise the issue in the Final Pretrial Order or at trial, and filed no response to Mr. Ellis's trial brief asserting the choice-of-law issue.

Mr. Ellis's assertions notwithstanding, "before applying any choice-of-law rules, I must determine whether or not there is a 'true conflict' between the laws of the nominee states, because if there is no such 'true conflict,' then no choice of law is required." *See Stults v. Symrise, Inc*, 969 F. Supp. 2d 735, 755 (N.D. Iowa 2013) (citing Eighth Circuit cases), *rev'd in other part on reconsideration sub nom. Stults v. Bush Boake Allen, Inc.*, No. C11-4077-MWB, 2014 WL 775525 (N.D. Iowa Feb. 25, 2014), *order clarified on other grounds sub nom. Stults v. Int'l Flavors & Fragrances, Inc.*, No. C11-4077-MWB, 2014 WL 4854652 (N.D. Iowa July 29, 2014). Mr. Ellis has not attempted to demonstrate a "true conflict" between Iowa law and South Dakota law on any issue in this case. Therefore, until and unless I discover such a conflict, I will assume that the law of the forum state, Iowa, applies.

## B.        Breach Of Contract

### 1.        Applicable law

As the Iowa Supreme Court has explained,

> To prove a breach of contract claim, a party must show:
>
> > (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.
>
> *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).  The first three elements address the existence of a contract. The last two elements address the breach of the contract and the damages caused by the breach.

*Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110–11 (Iowa 2013); *accord Gul v. Ctr. for Family Med.*, 2009 S.D. 12, ¶ 10, 762 N.W.2d 629, 633 (stating the "elements that must be met in a breach of contract claim are: (1) an enforceable promise; (2) a breach of the promise; and (3) resulting damage," *i.e.*, treating the existence of the contract as a single element, where Iowa law splits that first element into three).

The Iowa Supreme Court has also explained,

> The intent of the parties is controlling, and intent is to be determined from the language of the contract, when possible. [*Fed. Land Bank of Omaha v. Bollin*, 408 N.W.2d 56, 60 (Iowa 1987)] ("The objective is to ascertain the meaning and intention of the parties as expressed in the language used. It is the court's duty to give effect to the language of the contract in accordance with its plain and ordinary meaning and not make a new contract for the parties by arbitrary judicial construction."). Only if we find the contract ambiguous may we resort to extrinsic evidence to ascertain the contract's

> meaning. *See Clinton Physical Therapy Servs., P.C. v. John*
> *Deere*, 714 N.W.2d 603, 615–16 (Iowa 2006).

*In re Estate of Woodroffe*, 742 N.W.2d 94, 106 (Iowa 2007); *accord Coffey v. Coffey*, 2016 S.D. 96, ¶ 8, 888 N.W.2d 805, 809 (also explaining that the court must give words of a contract their "plain and ordinary meaning" and only apply other rules of construction if the contract is ambiguous).

### 2. *Analysis*

#### a. *Existence of the contract*

As to existence of a contract, *see Baccam*, 841 N.W.2d at 111 (first element of a breach of contract claim), Mr. Goldberg asserted throughout this litigation and at trial that he did not personally enter into any contract with Mr. Ellis, because, to the extent that there was a valid agreement, it was between Mr. Ellis and ACC. His only support for this contention is that the Engagement Agreement was addressed to him at "Alliance Capital Corp." and referred to his claimed title of "President/CEO" of that entity. I do not find Mr. Goldberg's contention persuasive on the record evidence.

The best evidence of who were the parties to the contract is found in the Engagement Agreement itself. *See Woodroffe*, 742 N.W.2d at 106. Here, the Engagement Agreement is in the form of a letter addressed "Dear Mr. Goldberg," states that it "describes the basis on which our firm will provide legal services to you and bill for those services," and states that "[y]ou are retaining us in the case of <u>United States v. Ronald Goldberg</u>, No. 4:11-cr-40111-KES, United States District Court for the District of South Dakota *to represent you. . . .*" Engagement Agreement at 1 (emphasis added). No person or entity other than Mr. Goldberg is identified anywhere in the Engagement Agreement as the party to whom services were to be provided or as the entity contracting for services on Mr. Goldberg's behalf. Mr. Goldberg also signed the Engagement Agreement under the representation, "I AGREE TO THE FOREGOING," above his printed name, with no addition of any office, capacity, or title relating to any other entity.

Thus, I find that Mr. Goldberg signed the Engagement Agreement in his individual capacity and that he is the party who contracted with Mr. Ellis in that Engagement Agreement.[4]

Next, as to terms of the contract, *see Baccam*, 841 N.W.2d at 111 (second element concerning existence of a contract), paragraph 3 of the Engagement Agreement, quoted above, explicitly, unequivocally, and unambiguously obligates Mr. Goldberg to pay a fixed fee of $65,000 including expenses. Engagement Agreement at 3 (¶ 3). It further specifies that Mr. Ellis would have no obligation to provide Mr. Goldberg with any legal services until Mr. Goldberg signed a copy of the contract and until Mr. Goldberg "further agree[d] that this agreement shall also serve as an irrevocable directive to Gary Mason, Esquire, by [Mr. Goldberg] for Mr. Mason to pay [Mr. Ellis] $65,000 from the Mortgage funds owed to Alliance Capital/Ronald Goldberg that will be received from the sale of the [Florida] property." *Id.* This mention of "Alliance Capital" does not make ACC a contracting party, however, because this clause imposes an obligation solely on Mr. Goldberg to irrevocably direct Mr. Mason to pay Mr. Ellis out of funds from the sale of the Florida property, without regard to any interest ACC might have had in those funds. The obligation to make an irrevocable directive is also separate from Mr. Goldberg's obligation to pay Mr. Ellis $65,000—that is, the obligation to pay was *not* contingent on the availability of funds from the sale of the Florida property or

_____

[4] Although I do not find any ambiguity in the contract as to the identity of the contracting parties, I note, nevertheless, that my conclusion that Mr. Goldberg, not ACC, was the contracting party is confirmed by the fact that the only "you" who required representation in the federal criminal case in South Dakota was Ronald Goldberg, as he was the only defendant in that case. *See* Plaintiff's Trial Ex. 28 (Fourth Superseding Indictment); *see also* 742 N.W.2d at 106 (resorting to extrinsic evidence only when the contract is ambiguous). Also, because I find as a matter of law and fact that Mr. Goldberg was the contracting party, I need not address Mr. Ellis's alternative "piercing the corporate veil" argument.

on an irrevocable directive to pay Mr. Ellis from those funds—but Mr. Ellis's obligation to provide services *was* contingent upon Mr. Goldberg providing the "irrevocable directive" to Mr. Mason to pay Mr. Ellis from the funds received from the sale of the Florida property. Mr. Goldberg did sign the Engagement Agreement, thus binding himself to the fee provision, including the obligation to make the irrevocable directive to Mr. Mason to pay Mr. Ellis from the funds from the sale of the Florida property.

As to other issues concerning the "existence" of the contract, I find, on the basis of overwhelming evidence, that Mr. Ellis performed his obligations under the Engagement Agreement. *See Baccam*, 841 N.W.2d at 111 (the third element concerning existence of the contract is that the plaintiff has performed all the terms and conditions required under the contract). There is no dispute that Mr. Ellis appeared for Mr. Goldberg's sentencing hearing and obtained the hoped-for sentence to time served. Furthermore, shortly after the sentencing hearing, Mr. Goldberg expressed his satisfaction with Mr. Ellis's services, *see* Plaintiff's Trial Exs. 5, 6, and Mr. Goldberg has never suggested that Mr. Ellis's services were inadequate.[5]

Mr. Goldberg contends, however, that Mr. Ellis demanded an additional fee that was contingent on obtaining a sentence requiring no additional prison time, which is unethical in a criminal matter. Mr. Goldberg argues that this is what happened when he signed another "Irrevocable Assignment" for an additional $25,000 (or $35,000, as indicated in that "Irrevocable Assignment") to Mr. Ellis, from his recovery in the *Watley* matter, if Mr. Ellis succeeded in obtaining a sentence involving no additional prison time.

---

[5] Indeed, I find it commendable that, notwithstanding Mr. Ellis's surprise when Mr. Goldberg later notified Mr. Ellis that he could not pay Mr. Ellis, Mr. Ellis's response included advising Mr. Goldberg of the consequences of failure to pay his restitution and a request for information to demonstrate to the court that Mr. Goldberg had not committed a fraud on the court with regard to his ability and intent to pay the restitution. *See* Plaintiff's Trial Ex. 7.

While it is possible that an unethical fee agreement would be unenforceable, *see, e.g.,* *Mlynarik v. Bergantzel*, 675 N.W.2d 584, 587 (Iowa 2004) (recognizing that Iowa has a long-standing rule against enforcement of or recovery on an illegal contract); *Gul*, 2009 S.D. 12, ¶ 10, 762 N.W.2d at 633 (requiring proof of an enforceable agreement as an element of a breach of contract claim), that principle would have no application, here. First, the "Irrevocable Assignment" of an additional payment is entirely separate from the parties' Engagement Agreement. Second, Mr. Ellis has made no attempt to enforce that "Irrevocable Assignment" in this case. Thus, the "Irrevocable Assignment" in no way makes the Engagement Agreement unenforceable, even if I accepted that it was an unethical contingent fee agreement. Third, I simply find Mr. Ellis's testimony that the "Irrevocable Assignment" was a "bonus" that was entirely Mr. Goldberg's idea is more credible, in light of all the evidence in the case, than Mr. Goldberg's contention that the "Irrevocable Assignment" was coerced out of him by a threat from Mr. Ellis to withdraw from representing him.

Thus, I find the existence of a binding contract for Mr. Goldberg to pay Mr. Ellis $65,000 for Mr. Ellis's services and that Mr. Ellis performed those services. I also find that, by signing the Engagement Agreement, Mr. Goldberg irrevocably directed Mr. Mason to pay Mr. Ellis from the funds received from the sale of the Florida property.

### b.    *Breach*

The remaining elements of Mr. Ellis's breach of contract claim are "breach" and "damages." *Baccam*, 841 N.W.2d at 111 (Iowa 2013); *accord Gul*, 2009 S.D. 12, ¶ 10, 762 N.W.2d at 633. "'A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract.'" *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) (quoting *Molo Oil*, 578 N.W.2d at 224); *accord Weitzel v. Sioux Valley Heart Partners*, 2006 S.D. 45, ¶ 31, 714

N.W.2d 884, 894 ("A breach of contract is defined as '[a] violation of a contractual obligation, either by failing to perform one's own promise or by interfering with another party's performance.' Black's Law Dictionary 182 (7th ed 1999). 'A breach may be one [sic] by non-performance, or by repudiation, or by both.' *Id*. (quoting Restatement (Second) of Contracts § 236 cmt. a (1981))."). I found, above, that one promise in the parties' Engagement Agreement was that Mr. Goldberg would pay Mr. Ellis $65,000 to represent him in his sentencing in South Dakota federal court. I now find, on the basis of overwhelming evidence, that Mr. Goldberg failed to perform that obligation and that he has offered no sufficient legal excuse for his failure to do so.

Thus, I find that Mr. Goldberg breached the parties' contract.

### c. *Damages*

"Under Iowa law, when a contract has been breached the nonbreaching party is generally entitled to be placed in as good a position as he or she would have occupied had the contract been performed." *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998); *accord Stern Oil Co., Inc. v. Brown*, 2018 S.D. 15, ¶ 16, 908 N.W.2d 144, 151, *reh'g denied* (Mar. 30, 2018) (explaining that, under South Dakota law, the purpose of damages for breach of contract is to place the person in the same position he would have occupied if the contract had been performed, and that recovery may not exceed the amount the plaintiff would have gained if the contract had been performed). Thus, to obtain damages for breach of contract, Mr. Ellis must prove that the damages resulted from Mr. Goldberg's breach and that those damages were "in the contemplation of the parties." *Royal Indem. Co.*, 786 N.W.2d at 847 (citing *Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 718 (Iowa 1994)); *accord Stern Oil Co.*, 2018 S.D. 15, ¶ 17, 908 N.W.2d at 151 ("[W]e have required that damages be a direct consequence of the breach of contract and reasonably within the contemplation of the parties at the time of making the contract."). The trier of fact "must scrutinize the

terms of the contract to determine whether the damages were within the contemplation of the parties," because "[t]he nature and terms of the contract necessarily dictate the damages recoverable." *Id.* Finally, "the damages [must] have some nexus with the breach, i.e., the damages recoverable for a breach of contract are limited to losses actually suffered by reason of the breach and must relate to the nature and purpose of the contract." *Id.* (citing *Midland Mut. Life Ins. Co.*, 579 N.W.2d at 831).

Here, damages that were plainly within the contemplation of the parties at the time of contracting, dictated by the terms of their agreement, and related to the nature and purpose of the contract are $65,000 in fees that Mr. Goldberg has not paid for Mr. Ellis's services. *See* Engagement Agreement, ¶ 3. IOWA CODE § 535.3 requires an award of pre- and post-judgment interest at a rate calculated according to IOWA CODE § 668.13. *See also* SDCL 21-1-13.1 (pre-judgment interest accrues from the date of the loss or damage); SDCL 15-16-3 (post-judgment interest accrues from the time of the verdict). Therefore, Mr. Ellis is entitled to pre- and post-judgment interest on this amount.

### *3.* *Summary*

Thus, my verdict is for Mr. Ellis on his breach of contract claim against Mr. Goldberg, with damages in the amount of $65,000, plus pre- and post-judgment interest.

## *C.* *Fraud*

In Count Two of his Complaint, Mr. Ellis alleges that Mr. Goldberg fraudulently represented to him that he would be paid $65,000 upon closing of the sale of the Florida property to induce Mr. Ellis to represent him. Mr. Goldberg denies this claim.

### *1.* *Applicable law*

To prove this fraud claim, Mr. Ellis must establish the following elements by clear and convincing evidence: (1) representation; (2) falsity; (3) materiality; (4) scienter;

(5) intent to deceive; (6) reliance; and (7) resulting injury and damage. *Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005); *Whalen v. Connelly*, 545 N.W.2d 284, 294 (Iowa 1996); *accord Estate of Johnson by & through Johnson v. Weber*, 2017 S.D. 36, ¶ 27, 898 N.W.2d 718, 729, *reh'g denied* (July 28, 2017).

Of particular importance, here, is the difference between fraud and broken promises. As the Iowa Supreme Court has explained,

> When a promise is made in good faith, with the expectation of carrying it out, the fact that it subsequently is broken gives rise to no cause of action, either for deceit, or for equitable relief. Otherwise any breach of contract would call for such a remedy. The mere breach of a promise is never enough in itself to establish the fraudulent intent.

*Smidt*, 695 N.W.2d at 23 (quoting *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 29 (Iowa 1997)); *accord Grynberg v. Citation Oil & Gas Corp.*, 1997 S.D. 121, ¶ 61, 573 N.W.2d 493, 509). On the other hand, "[a] statement of intent to perform a future act is actionable only when spoken with the existing intention not to perform." *City of McGregor v. Janett*, 546 N.W.2d 616, 619 (Iowa 1996); *accord Beals v. AutoTrac, Inc.*, 2017 S.D. 80, ¶ 19, 904 N.W.2d 765, 770 (citing SDCL 53-4-5). Stating the same principle the other way around, "in establishing the present intent not to perform, '[t]he fact the agreement was not performed does not alone prove the promissor did not intend keeping it when it was made.'" *Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 565 (Iowa 1987) (quoting *Lamasters v. Springer*, 251 Iowa 69, 74, 99 N.W.2d 300, 303 (1959)). The trier of fact must assess the quantum and quality of evidence of a party's subsequent actions—such as the length of time between the promise and its breach and evidence of inconsistent or misleading conduct—to decide whether that evidence proves that the promissor did not intend to keep the promise when he made it. *Id.* at 565-66.

## 2.     Analysis

### a.     Proof of fraud

In his trial brief, Mr. Ellis asserts that Mr. Goldberg made three fraudulent representations to induce Mr. Ellis to represent him:  that Mr. Ellis would be paid $65,000; that Mr. Goldberg had an interest in a Florida property that would be the source of funds to pay Mr. Ellis; and that Mr. Goldberg was giving Gary Mason an "irrevocable directive" to pay Mr. Ellis.  I have no hesitation finding that, as to each of these representations, Mr. Ellis has proved that the representation was made, was material, was relied on by Mr. Ellis in undertaking Mr. Goldberg's representation, and resulted in damage, in that Mr. Ellis has not been paid—that is, that Mr. Ellis has established the first, third, sixth, and seventh elements of his fraud claim.  *See Smidt*, 695 N.W.2d at 22.  This finding is based on the testimony of the parties and the provisions of ¶ 3 of the Engagement Agreement.

The more hotly contested elements are the second, fourth, and fifth, that is, falsity of the representations when made, Mr. Goldberg's knowledge of that falsity, and Mr. Goldberg's intent to deceive Mr. Ellis.  *Id*.  All three of these elements depend upon evidence of Mr. Goldberg's subsequent conduct.  This is so, because the representations were not patently false when made, because Mr. Ellis's own evidence shows that Mr. Goldberg did have an interest in the Florida property and that Mr. Goldberg's interest was not only sufficient to cover Mr. Ellis's fee, but matched the represented amount of that interest.  Thus, the questions of falsity and Mr. Goldberg's knowledge of falsity in this case all turn on "intent to deceive," specifically, on whether there is evidence that Mr. Goldberg made false representations, because he never intended to pay Mr. Ellis $65,000, never intended the sale of the Florida property to be the source of funds to pay Mr. Ellis, and/or never intended to give Gary Mason an "irrevocable

directive" to pay Mr. Ellis. Again, evidence that Mr. Goldberg broke his promises, standing alone, does not prove intent to deceive. *Robinson*, 412 N.W.2d at 565.

I can and do infer from evidence presented by Mr. Ellis that Mr. Goldberg did not intend to pay Mr. Ellis at the time he represented that he would do so, that he did not intend to do so from proceeds of the sale of the Florida property, and that he did not intend to "irrevocably" direct Mr. Mason to pay Mr. Ellis. First, less than a month elapsed between Mr. Goldberg making the representations and entering into the Engagement Agreement with Mr. Ellis and then taking action that was plainly contrary to the representations by signing a satisfaction of the mortgage on the property, a release discharging ACC's lien on that property, and a release of the Notice of Affidavit of Interest. *See* Plaintiff's Trial Exs. 23, 25, 26. Furthermore, the signing of the satisfaction and releases occurred on the very day that Mr. Ellis was fulfilling his obligation to appear at Mr. Goldberg's sentencing hearing, so the releases were not made until it was "safe" to do so, because Mr. Ellis had already performed. *See Robinson*, 412 N.W.2d at 565-66 (considering the time between promises and breach or action inconsistent with the promises). Furthermore, more than two weeks elapsed between Mr. Goldberg's release of his interests in the Florida property and his informing Mr. Ellis that there was a problem using the money from the sale of the Florida property to pay him, but Mr. Goldberg clearly knew that was the situation from the moment he released his interests in that property.

Just as suggestive of Mr. Goldberg's intent to deceive is the fact that, when he did tell Mr. Ellis he could not pay him from the proceeds of the sale of the Florida property, he produced a patently false "cover story" that there were judgments against him that he didn't know about. First, Mr. Goldberg has never produced any evidence of any such judgments. Second, when Mr. Goldberg released his interest in the Florida property, he *either* did so in ignorance of those judgments, so he knew that the release was the real

reason that he could not pay Mr. Ellis, *or* Mr. Goldberg had released his interest in the Florida property precisely because he knew of those judgments, so that he falsely represented his intent to pay Mr. Ellis from the proceeds of the sale of the Florida property, because he knew he had released those proceeds to pay the judgments.

In short, Mr. Goldberg engaged in the sort of misleading or inconsistent conduct that the Iowa Supreme Court suggested in *Robinson*, 412 N.W.2d at 565-66, would support a finding of intent to deceive.

Thus, I find in favor of Mr. Ellis on his claim of fraud against Mr. Goldberg.

### b.      *Damages*

Because I find in favor of Mr. Ellis on his fraud claim, I must decide what, if any, damages to award. As the Iowa Supreme Court has explained,

> Generally, Iowa law recognizes two basic methods to measure damages in fraud cases. *Midwest Home Distrib.[, Inc. v. Domco Indus. Ltd.]*, 585 N.W.2d [735,] 739 [(Iowa 1998)]. The first measure of damages provides compensation for the benefit of the bargain. *Id*. The second measure of damages is the out-of-pocket rule. *Id*.

*Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 739 n.5 (Iowa 2009). Here, the "benefit of the bargain" damages would be an award of the $65,000 in fees that Mr. Ellis was to receive under the parties' bargain. Although I find that Mr. Ellis is entitled to $65,000 in compensatory damages on his fraud claim, his lost fees can only be awarded once, without impermissible duplicative or overlapping damages, and the same $65,000 for lost fees was also awarded on the breach of contract claim. *See, e.g., Channon v. United Parcel Serv.*, 629 N.W.2d 835, 851 (Iowa 2001) (recognizing that "[d]uplication of damages . . . is an issue," and citing *Team Central, Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 925 (Iowa 1978), which noted that "[t]he purpose of damages is to restore an injured party to the position he enjoyed before his injury," and that therefore "[d]uplicate or overlapping damages are to be avoided"); *accord Landstrom v. Shaver*, 1997 S.D. 25, ¶

91, 561 N.W.2d 1, 19 ("We have held that duplication of damages of the same nature and purpose are not appropriate." (quoting *Mash v. Cutler*, 488 N.W.2d 642, 646 (S.D. 1992))). Thus, the judgment must direct the payment of only one such award.

The remaining question is what *additional* damages, if any, to award on the fraud claim. Where a defendant's breach of contract also amounts to fraud, an intentional tort, there is a sufficient factual and legal basis for the court to award punitive damages. *Wilson v. Vanden Berg*, 687 N.W.2d 575, 587 (Iowa 2004); *accord Grynberg*, 1997 S.D. 121, ¶ 18, 573 N.W.2d at 500 (punitive damages are available when an independent tort, such as fraud, occurs beyond mere breach of a contract). As the Iowa Supreme Court has explained,

> To receive punitive damages, a plaintiff must demonstrate "by a preponderance of clear, convincing, and satisfactory evidence that the defendant's conduct amounted to a willful and wanton disregard for the rights or safety of another." [*Beeman v. Manville Corp. Asbestos Disease Compensation Fund*, 496 N.W.2d 247, 255 (Iowa 1993)].

*Kinseth v. Weil-McLain*, 913 N.W.2d 55, 78–79 (Iowa 2018); *accord Smizer v. Drey*, 2016 S.D. 3, ¶ 20, 873 N.W.2d 697, 703 ("Punitive damages are warranted 'where the defendant has been guilty of oppression, fraud, or malice, actual or presumed . . . committed intentionally or by willful and wanton misconduct, in disregard of humanity[.]" (quoting SDCL 21–3–2)).[6]

More specifically, the Iowa Supreme Court has explained,

> Willful and wanton conduct involves an intentional, unreasonable act "'"in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow."'" *Cawthorn v. Catholic Health Initiatives*

---

[6] Although it does not appear that South Dakota imposes a "clear and convincing evidence" burden of proof on punitive damages, if the burden under Iowa law is met, it follows that so is the burden under South Dakota law.

> *Corp.*, 743 N.W.2d 525, 529 (Iowa 2007) (quoting *Kiesau v. 4Bantz*, 686 N.W.2d 164, 173 (Iowa 2004)). Such an act is ""usually accompanied by a conscious indifference to the consequences."'" *Id.* More than negligent conduct is required to support a punitive damage award. *Id.* It was [the plaintiff's] burden to prove [the defendant] acted with actual or legal malice. *Id.* Actual malice may be shown by personal spite, hatred, or ill will. ""[L]egal malice may be shown by wrongful conduct committed with a willful or reckless disregard of the rights of another."'" *Id.* (quoting *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005)).

*Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 689–90 (Iowa 2010); *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 245 (Iowa 2009) (finding a jury question on punitive damages where the defendant acted with his interests in the forefront in making false promises and with conscious disregard of the rights of others, where the defendant knew information making fulfillment of the promise highly unlikely or impossible).

I find that this is clearly a case in which punitive damages are appropriate, because of the willfulness and wontonness of Mr. Goldberg's conduct, *see Kinseth*, 913 N.W.2d at 78–79; *accord Smizer*, 2016 S.D. 3, ¶ 20, 873 N.W.2d at 703, as demonstrated by Mr. Goldberg's commission of wrongful conduct with reckless disregard of Mr. Ellis's rights. Mr. Goldberg is not just a habitual fraudster, but he engaged in frauds both to induce Mr. Ellis to enter into the Engagement Agreement without prepayment of a retainer, then engaged in further frauds to put his own interests to the forefront, knowing that he had released his interests in the Florida property, so that fulfillment of his promises was impossible. *See Van Sickle Constr. Co.*, 783 N.W.2d at 689-90; *Spreitzer*, 779 N.W.2d at 245.

Under Iowa law, the court considers the amount of punitive damages in light of "(1) the extent and nature of the outrageous conduct, (2) the amount necessary to deter

such conduct in the future, (3) the relative size of the punitive damages award as compared to actual damages and, (4) surrounding circumstances bearing on the relationship of the parties." *Hamilton v. Mercantile Bank of Cedar Rapids*, 621 N.W.2d 401, 407 (Iowa 2001) (citing *Ezzone v. Riccardi*, 525 N.W.2d 388, 399 (Iowa 1994)). Here, Mr. Goldberg's conduct was not only outrageous, but his repeated frauds suggest that a very substantial amount of punitive damages is required to deter such conduct in the future, where it is clear that a criminal conviction did not provide such deterrence. *Id.* (first and second factors). Mr. Goldberg's conduct was all the more outrageous in light of the surrounding circumstances, where he was attempting to induce Mr. Ellis to represent him at sentencing for the purpose of obtaining a time-served sentence for prior frauds. *Id.* (fourth element). Under the circumstances, I find that a punitive damages award of $260,000—that is, four times the compensatory damages award—is the appropriate relative size. *Id.* (fourth factor). This single-digit multiplier also comports with federal constitutional concerns. *See Wolf v. Wolf*, 690 N.W.2d 887, 895-96 (Iowa 2005) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), and *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)).

Thus, I find that $65,000 in compensatory damages are appropriate on Mr. Ellis's fraud claim, and I find that $260,000 in punitive damages are also appropriate on that claim. I also find that the conduct of Mr. Goldberg was directed specifically at Mr. Ellis. *See* IOWA CODE § 668A1.1(b).

## D.    Unjust Enrichment

Neither Iowa nor South Dakota allows a recovery for unjust enrichment in a case involving an express contract on the same matters. *See, e.g., Legg v. W. Bank*, 873 N.W.2d 763, 771-72 (Iowa 2016); *accord, e.g., Surgical Inst. of S. Dakota, P.C. v. Sorrell*, 2012 S.D. 48, ¶ 28, 816 N.W.2d 133, 141. Because I have found for Mr. Ellis

on his claim of breach of an express contract, I do not reach Mr. Ellis's alternative claim of unjust enrichment.

## III.   CONCLUSION

Upon the foregoing, my verdict on Mr. Ellis's claims against Mr. Goldberg is as follows:

1.      I find in favor of Mr. Ellis on his claim of breach of contract against Mr. Goldberg and award Mr. Ellis $65,000 in compensatory damages on that claim;

2.      I find in favor of Mr. Ellis on his claim of fraud against Mr. Goldberg, I award $65,000 in compensatory damages, $260,000 in punitive damages, and I find that the conduct of Mr. Goldberg at issue was directed specifically at Mr. Ellis; and

3.      I find that, because there was an express contract between the parties, Mr. Ellis's unjust enrichment claim against Mr. Goldberg is moot.

Because the compensatory damages awarded on the breach of contract and fraud claims are duplicative, **judgment shall enter** awarding Mr. Ellis $65,000 in compensatory damages, plus pre- and post-judgment interest, and $260,000 in punitive damages, plus post-judgment interest.

**IT IS SO ORDERED**.

**DATED** this 15th day of January, 2019.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA